1  Andrew T. Ryan, Esq. (SBN 227700)
   THE RYAN LAW GROUP
2  317 Rosecrans Ave.
   Manhattan Beach, CA 90266
3  Tel: (310) 321-4800
   Fax: (310) 496-1435
4  Andrew.ryan@theryanlawgroup.com

5
   Attorneys for Plaintiffs
6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12
   MICHAEL MOLLOY, on behalf of          Case No.
13 himself and those similarly situated,
                                         **CLASS ACTION COMPLAINT**
14            Plaintiffs,
                                            1. **Violation of California's Unfair**
15      v.                                     **Competition Law ("UCL")**
                                            2. **Violation of California False**
16 TRIWIN INC., a foreign corporation,        **Advertising Law ("FAL")**
   and TRIWIN GAMES CO., LTD., a          3. **Violation of the California**
17 foreign corporation,                       **Consumer Legal Remedies Act**
                                               **("CLRA")**
18            Defendant.                    4. **Fraud**
                                            5. **Negligent Misrepresentation**
19

20

21

22                                       **DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

Michael Molloy ("Mr. Molloy"), a citizen of Los Angeles County, hereby brings this Complaint on behalf of himself and those similarly situated against Defendant Triwin Inc., a foreign corporation registered in the Cayman Islands and Triwin Games Co. Ltd., a foreign corporation registered in Hong Kong (collectively "Defendants"). Plaintiff alleges as follows:

## INTRODUCTION

1.     Defendants develop, distribute, and operate the mobile game Tycoon Casino ("Game") that competes in the so-called "social casino" market.

2.     The Game provides users with virtual slot machines that are played with virtual gold coins. Users bet the coins and win or lose those coins based on the randomized outcomes of the Game's slot machines.

3.     When users run out of coins – a highly likely outcome – users are unable to continue playing the Game's slot machines. At that time, the Game presents users with prompts encouraging them to purchase more virtual coins in exchange for real world money to continue their gameplay. The shop where users are directed to purchase more coins purports to offer significant sales and discounts for the purchase of virtual coins with misleading coin quantity comparisons.

4.     The Ninth Circuit has held that earlier versions of Big Fish Casino, a mobile game that also offers virtual slot machines, "constitutes illegal gambling under Washington law." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018). The Game here likewise constitutes illegal gambling under California law.

5.     This lawsuit is brought on behalf of Plaintiff and those similarly situated who have had their money taken from the Game's illegal slot machines and who have been deceived into making in-game purchases of deceptively marketed coins in the Game.

6.     Defendants develop and publish the Game, which is playable on

various platforms, including iPhone and Android devices.

7.      On information and belief, the Games are distributed under developer agreements with Apple Inc. ("Apple") and Google, LLC ("Google").

8.      On information and belief, Apple and Google are entities headquartered in California.

9.      The Game can be downloaded for free from the Apple App Store and Google Play store. The Game's simulated slot machines are akin to those found in real world casinos. The Game gives new players an initial balance of virtual coins allowing access to gameplay.

10.     After consumers lose their initial allotment of coins, the Game attempts to sell those consumers additional coins. Without additional coins, consumers cannot play the Game's slot machines.

11.     Freshly topped off with additional coins, consumers wager to win more coins in the Game's slot machines. The coins won by consumers playing the Game's slot machines are identical to the coins that are sold in the Game.

12.     The function of the Game's coins is to place bets in the Game's slot machines to access those games of chance and extend players' ability to play those slot machines.

13.     On information and belief, despite purporting to be a free-to-play Game, Defendants reap massive profits by selling "in-app" bundles of virtual coins. Players of the Game make these in-app purchases for the purpose of being able to continue playing the Game's slot machines when they lose their coins to those games of chance.

14.     In addition to the addictive nature of the slot machines themselves, in order to induce users to make in-game purchases, in its marketing to consumers at the time of purchase, the Game advertises sale deals for virtual coins that are false and misleading. Specifically, the Game's store provides comparisons to fictitious

coin quantities for coin bundles.

**The Game Provides Illegal Slot Machines Under California Law**

15.     By making, operating, giving away and entering into agreements related to the Game, Defendants have violated California's gambling laws, including the law prohibiting slot machines. In so doing, Defendants have illegally profited from thousands of consumers.

16.     California Penal Code §330b prohibits slot machines. Subsection (a) states that "[i]is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease…any slot machine or device, as defined in this section." Cal. PEN §330b(a).

17.     Defendants manufacture, repair, own, rent, lease or give away the Game and its slot machines.

18.     California Penal Code §330b(a) further provides that "[i]t is unlawful for any person to make or to permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device, or to receive any check, slug, token, or memorandum entitling the holder to receive money, credit, allowance, or other thing of value."

19.     On information and belief, Defendants made or permitted the making of agreements with others regarding the Game, including with Apple, Google and players of the Game.

20.     Users of the Game, as a result of the element of chance, may become entitled to receive virtual coins, which are a credit, allowance or other thing of value or an additional chance or right to use the Game's slot machines.

Specifically, players of the Game's slot machines receive virtual coins that provide players with the additional chance or right to continue playing slot machines in the Game. The slot machines in the Game are purely games of chance and involve no skill from the players.

21.    California Penal Code 330b(d) provides: "For purposes of this section, 'slot machine or device' means a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device..."

22.    The Game falls within the definition of slot machine or device under section 330b(d). Users exchange real money for virtual coins in the Game. The Game's slot machines are games of chance in which the user may receive or lose additional virtual coins. Virtual coins are a thing of value or an additional chance to use the slot machines in the Game.

23.    The Ninth Circuit has found that virtual coins similar to those in the Game constitute a thing of value under Washington's gambling law: "The virtual coins, as alleged in the complaint, permit a user to play the casino Game inside the virtual Big Fish Casino. They are a credit that allows a user to place another wager or re-spin a slot machine. Without virtual coins, a user is unable to play Big Fish Casino's various Game.  Thus, if a user runs out of virtual coins and wants to continue playing Big Fish Casino, she must buy more coins to have the privilege of playing the game. Likewise, if a user wins coins, the user wins the privilege of playing  Big Fish Casino without charge. In sum, these virtual coins extend the

privilege of playing Big Fish Casino." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018). The same is true for the Game here.

**The Game Engages in False and Misleading Advertising**

24.    The Game presents false and misleading advertising to induce players into spending money within the Game.

25.    The Game's store where users purchase virtual coins are misleading by offering for sale a particular coin quantity for a listed price with a comparison to a lower stricken coin quantity. Consumers reasonably understand the stricken coin quantity in these advertisements to represent the ordinary or prevailing deal for coins offered to users of the Game on a regular basis for a reasonably substantial period of time.

26.    The stricken coin quantities presented to new users are fictitiously low and do not represent the ordinary or prevailing deal offered to other users of the Game on a regular basis.

27.    In so doing, the Game misleads consumers, particularly new players to the Games, into believing that the offered sales were providing an outsized value as compared to the ordinary or prevailing deal offered by the Game. This false belief was a material consideration for consumers to make in-game purchases and consumers reasonably relied on that belief in their purchase decision.

28.    The Federal Trade Commission ("FTC") describes various forms of false price comparison schemes as deceptive: "One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide

but fictitious - for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects." 16 CFR §233.1(a). "The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based." 16 CFR §233.1(b). "Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced. 16 CFR §233.1(d).

29. California statutory and regulatory law also expressly forbids false discounted pricing schemes: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501. Section 17501 defines "prevailing market price" as "the worth or value of any thing advertised…at the time of publication of such advertisement in the locality wherein the advertisement is published."

30. Defendants have control and knowledge over the pricing and advertisement of coins in the Game and therefore knew, or should reasonably have known, that its comparative coin quantity advertising and statements regarding sale

duration were false, deceptive, misleading, and unlawful.

31.     Defendants fraudulently concealed from and intentionally failed to disclose to consumers the truth about its advertised discounts and purported limited time sales.

32.     Through this false and deceptive marketing, advertising, and pricing scheme, Defendants violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

## PARTIES

33.     Plaintiff Michael Molloy is a citizen and resident of Los Angeles County, California. He downloaded the Game on his iPhone from the Apple App Store in Los Angeles County. He played the Game in this County. He accessed the Game's virtual store and saw its false advertising in this County. He was induced by this false advertising into making an in-game purchase in this County from the in-game store. He made a purchase from the Game through his Apple iPhone and Apple payment account.

34.     On information and belief, Triwin Inc. is a corporation organized and existing under the laws of the Cayman Islands. On information and belief, Triwin Inc.'s principal place of business is located at F23 2307, T2 Foresea Life Center, Xin'an Street, Bao'an District, Shenzhen, China.

35.     On information and belief, Triwin Games Co., Ltd. is a corporation organized and existing under the laws of Hong Kong. On information and belief, Triwin Games Co. Ltd.'s principal place of business is Rm.4B, Kingswell Comm Tower, 171-173 Lockhart Rd., Wanchai, Hong Kong.

36.     Upon information and belief and at all times relevant to this Complaint, Triwin Inc. and Triwin Games Co. Ltd. operated as one company to market and sell the Game throughout the U.S., including California.

37.     Upon information and belief and at all times relevant to this Complaint: Triwin Inc. and Triwin Games Co., Ltd. were agents, servants, employees, co-conspirator, partners, joint venturers, and/or alter ego of each other, and were at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

38.     Upon information and belief and at all times relevant to this Complaint, Defendants aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein. In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, Defendants acted with an awareness of their primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

40.     This Court has personal jurisdiction over Defendants, because each conducts substantial business and directs its activities into California and this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

41.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to Defendants' professional and commercial activities within California, and therefore the Defendants are subject to the specific jurisdiction of the courts of this state. Specifically,

Defendants publish, advertise, distribute and profit from the Game and directs

activities for this Game through California entities, including Apple and Google.

42.    On information and belief, Defendants generate the majority of the

Game's revenue through the publishing, distribution and monetization of the Game

through contractual relationships with California entities, Apple and Google.

43.    Venue is proper in this court because at all relevant times Mr. Molloy

resided in the County of Los Angeles, California and the claims asserted in this

complaint arise out of acts, transactions, and conduct that occurred in whole or in

part within the County of Los Angeles, California.

## **FACTS**

44.    The proliferation of internet-connected mobile devices has led to the

growth of what are known in the industry as "free-to-play" videogames. The term

is a misnomer. It refers to a model by which the initial download of the game is

free, but companies reap huge profits by selling thousands of "in-app" items that

start at $0.99 but can quickly escalate to hundreds or even thousands of dollars.

45.    The in-app purchase model has become particularly attractive to

developers of games of chance (e.g., poker, blackjack, and slot machine mobile

videogames, amongst others), because it allows them to generate huge profits. In

2022, the global social casino game market reached $6.83 billion and is projected

to grow to $8.7 billion in 2026.[1]

---

[1] *Global Social Casino Game Market Report 2022-2026 Featuring Caesars
Entertainment, Aristocrat Leisure, Zynga, Playtika, Scientific Game Corp and
DoubleU Game*, Research and Markets (April 26, 2022), available at:
https://www.globenewswire.com/en/news-
release/2022/04/26/2428795/28124/en/Global-Social-Casino-Game-Market-
Report-2022-2026-Featuring-Caesars-Entertainment-Aristocrat-Leisure-Zynga-
Playtika-Scientific-Game-Corp-and-DoubleU-Game.html (last accessed February
6, 2023).

46.    Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing casino Game and stated that: "[Researchers] found that casino gamers share many similar sociodemographic characteristics (e.g., employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in casino Game. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino Game were their first experiences with gambling…According to [another study], the purchase of virtual credits or virtual items makes the activity of casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, only 1–5% of casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60% of all casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits." Hyoun S. Kim, Michael J. A. Wohl, et al., *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming* (Nov. 14, 2014), available at http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf  (citations omitted).

47.    Many of the players of these social casino games likely have psychological addictions to playing. See August 1, 2018 letter from Natasha Dow Schüll, Ph.D. to Washington State Gambling Commission (available at

1  https://www.wsgc.wa.gov/sites/default/files/public/news/big-
2  fish/Dr.%20Schull%20Comments.pdf).

3  **Overview of Tycoon Casino**

4      48.    Tycoon Casino is a mobile application casino-style game developed
5  and distributed by Defendants. The game is available on iPhone and Android
6  devices through the Apple App Store and Google Play platforms, respectively.

7      49.    Tycoon Casino was first released in 2018.

8      50.    On information and belief, Tycoon Casino was first developed,
9  published and released by Triwin Games Co., Ltd. in 2018.

10     51.    On information and belief, Triwin Inc. publishes and distributes
11  Tycoon Casino through the Apple App Store.

12     52.    Tycoon Casino provides users with a variety of slot machines on their
13  mobile device in addition to other games of chance. Below is an example of one
14  such slot machine in Tycoon Casino:



23     53.    In order to play the slot machines in Tycoon Casino, users must bet
24  virtual coins, as can be seen at the bottom left in the image above where it says
25  "TOTAL BET." The slot machines in Tycoon Casino require a minimum bet, such
26  that if a user's coin balance is below that minimum, the user cannot play the slot
27  machine. For example, in the slot machine depicted above, the minimum bet

allowed is 250,000 coins.

54.    The slot machines in Tycoon Casino have all the same trappings as real-world slot machines, including flashing graphics and sound effects. The slot machines in Tycoon Casino are games of chance. The outcome of any given spin is random and not dependent on the user's inputs or skills. Indeed, users can set the slot machines to "auto-spin" for unlimited consecutive spins to reduce or eliminate the need to interact with the game.

55.    Users are encouraged by Tycoon Casino to make as large a bet as possible through various user interfaces.

56.    Users are allotted an amount of coins when they first download and play the game. They may be awarded more coins through playing the slot machine games in Tycoon Casino. When a user runs out of coins or attempts to spin a slot machine for a bet amount exceeding their balance of virtual coins, they are presented with one or more pop-up advertisements offering the sale of additional virtual coins in exchange for real world currency and directed to the game's store.

57.    The coins purchased by a user for real world money is used to extend their ability to play the slot machines in Tycoon Casino. These purchased virtual coins are identical to those bet in the slot machines and subject to the chance of winning or losing of those slot machines.

58.    When a user attempts to play a slot machine in Tycoon Casino but has an insufficient quantity of coins, the user is presented with the following sequence of screens:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20









59.     Without obtaining more coins, the user is unable to continue playing. The coins the user is repeatedly encouraged to purchase are used to extend his or her gameplay.

60.     After three screens encouraging a user to purchase more coins for real world money, a fourth screen offers a user the chance to watch an advertisement to receive a relatively small amount of coins. The advertisement is often for another mobile casino game and lasts at least 30 seconds.

61.     Purchasing coins to avoid viewing advertisements provides value to

1  the players by allowing for extended uninterrupted play. This value is measurable,

2  for example, but the amount of money Defendants receive from the advertiser.

3      62.      Below is an image of the Tycoon Casino in-game store presented to a

4  new user:



Figure 1

15      63.      The Shop purports to offer coins on "sale" with the user to receive

16  "200% MORE ON FIRST PURCHASE." At each price point an offered coin

17  quantity is presented above a stricken coin quantity, communicating that the

18  stricken coin quantity is the ordinary, prevailing or standard quantity of coins for

19  each price point offered in Tycoon Casino. For example, the offer nearest the

20  bottom of Figure 1 has 200 million coins stricken with 600 million coins in large

21  and bold font above. A consumer would reasonably understand this to mean that

22  the normal, ordinary, or prevailing quantity of coins for $1.99 offered by Tycoon

23  Casino is 200 million.

24      64.      This first purchase sale shown in Figure 1 also includes stricken dollar

25  values on the right, with each quantity of coins being offered at $1.99 and the

26  purported standard prices stricken alongside.

27      65.      After a user makes a first purchase, the shop in Tycoon Casino does

not offer the stricken quantity of coins presented in Figure 1. Instead, the sales continue, albeit at a purported 5% increase of coins instead of 200%:



Figure 2

66.    Later that same day, a purported sale offering a 10% increase in coin quantities is in the Tycoon Casino store:



Figure 3

67.    The following day, a purported sale offering a 15% increase in coin quantities is in the Tycoon Casino store:



Figure 4

68.    The 15% sale shown in Figure 4 then persists for more than 3 months and longer. The stricken chip quantities at each price points shown in Figures 1-4 are therefore fictitious, because they do not truthfully represent the ordinary, prevailing or standard quantity of coins offered in Tycoon Casino.

69.    On information and belief, Tycoon Casino does not offer the stricken coin quantities for the listed prices shown in Figure 1-4 over a 90-day period, if ever. To the extent the stricken chip quantities are ever offered for the listed prices points, they are only offered for trivial periods of time. Based on investigation of counsel over the past year, Tycoon Casino has never, for example, offered 200,000,000 coins for $1.99 as the strikethroughs in Figures 1-4 suggest. Rather, Tycoon Casino always offers more than 200,000,000 coins for $1.99 and the representation that 200,000,000 coins for $1.99 is the ordinary or prevailing offer for coins in Tycoon Casino is false. The same is true for the other coin values and the other price points.

70.    The advertising, pricing and quantity of coins in the Game is within Defendants' knowledge and control.

71.    Defendants had actual knowledge that the false strikethrough ads and false limited time sales contained false or misleading misrepresentations as to their prior values and as to their duration. Defendants designed and promoted these advertisements while having actual knowledge that these quantitative representations of sale values were false.

72.    Defendants promoted these advertisements to create a false sense of urgency in its players to induce those players into purchasing the coin bundles. Defendants did so while knowing that the bundles contained quantitative misrepresentations with respect to the comparative value of the coin quantities displayed.

73.    The amount of coins included in a bundle and its comparative value to

the stated standard quantity of coins offered at the same price is a material

consideration when a player decides whether to purchase a bundle.

74.    These pricing and advertising practices reflecting high-pressure fake

sales are patently deceptive. They are intended to mislead customers into believing

that they are getting a bargain by buying virtual coins on sale and at a substantial

and deep discount.

**Plaintiff's Experience with Tycoon Casino**

75.    Mr. Molloy found Tycoon Casino in the Apple App Store. In the

absence of any disclaimers or warnings to the contrary, he reasonably believed

Tycoon Casino complied with the law. Had Mr. Molloy known that Tycoon Casino

was engaged in illegal gambling, he would not have downloaded and began

playing it.

76.    On or about December 2021, Mr. Molloy entered the Tycoon Casino

shop, and saw a presentation the same or substantially similar to that depicted in

Figure 1. Mr. Molloy reasonably understood that the stricken coin quantities shown

in the shop were the ordinary, normal and prevailing quantity of coins offered by

Tycoon Casino to its users at each price point shown.

77.    Mr. Molloy purchased his first coin pack from the Tycoon Casino

store priced at $1.99 on or around January 6, 2022.

78.    Mr. Molloy's reasonable understanding that the stricken coin

quantities were the ordinary, prevailing or standard quantity of coins offered in

Tycoon Casino was a material factors in his decision to make his in-game

purchases. Mr. Molloy reasonably relied on this understanding in making his

purchase decision, a decision he would not have made had he known the stricken

coin quantities were fictitious.

79.    Mr. Molloy continued to play Tycoon Casino until he lost all his

coins, at which time he was again prompted to purchase more coins purportedly on

sale. Mr. Molloy purchased two additional coins packs priced at $4.99 on or about February 12, 2022 to continue playing the Game's slot machines.

**The Games Violate California Gambling Laws**

80.    The Games violate various California gambling laws, including California Penal Code §330b, which prohibits slot machines.

81.    California courts have observed that the plain text of this statute sets forth three key elements: payment, chance, and prize. *See People ex rel. Green v. Grewal*, 61 Cal.4th 544, 564, 189 Cal.Rptr.3d 686, 699, 352 P.3d 275, 286 (2015) (quoting *Trinkle v. Stroh*, 60 Cal.App.4th 771, 782, 70 Cal.Rptr.2d 661, 667 (1997). First, the machine or device must be activated by "the insertion of money or [some] other object." *Trinkle v. Cal. State Lottery*, 105 Cal.App.4th 1401, 1410, 129 Cal.Rptr.2d 904, 910 (2003). Second, "the operation of the machine [must be] unpredictable and governed by chance." *Id*. Third, "by reason of the chance operation of the machine, the user may become entitled to receive a thing of value." *Id*.

82.    Virtual currency in a mobile game, purchased with real money, has been found to be the insertion of money or some other object under §330b. *Soto v. Sky Union, LLC*, 159 F.Supp.3d 871, 878-89 (N.D. Ill. 2016) ("This argument disregards the plain language of section 330b(d), which provides that in addition to machines or devices that require the insertion of money or coins, the term 'slot machine or device' includes devices that may be operated 'by any other means.' Cal. Penal Code § 330b(d). Moreover, it would make little sense to read the broad language of section 330b(d) to capture game operated by insertion of purchased physical tokens while excluding game operated by insertion of purchased virtual gems. For the purpose of determining whether Castle Clash is functionally a slot machine when players engage in Rolls, it does not matter that gems are imaginary currency.").

83.     Defendants manufacture, repair, own, rent, lease and give away the slot machines in the Game. Defendants develop the software for the Game. Defendants provide updates to the Game's software to fix bugs and otherwise update the Game's slot machines. Defendants offers the Game for free through iOS and Android mobile storefronts. Defendants own the Game. Defendants provide the software for the Game to Apple and Google for players to download on their mobile devices.

84.     On information and belief, Defendants made or permitted the making of agreements with other people regarding the Game, including Apple, Google and players of the Game, by which users of the Game's slot machines, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive credit, allowance, or other thing of value or additional chance or right to use the Game's slot machines.

85.     The outcomes of the slot machines in the Game are the result of the element of chance. Depending on the outcome of a slot machine spin in the Game, a user may receive or lose virtual coins. That outcome is random and not determined by the player's skill.

86.     Virtual coins in the Game are a credit, allowance or other thing of value or an additional chance or right to use the slot machines in the Game.

87.     On information and belief, the Game is not located upon or are being transported by a vessel regularly operated and engaged in interstate or foreign commerce.

88.     On information and belief, Defendants do not conduct their business activities with respect to the Game in accordance with the terms of a license issued by a tribal gaming agency pursuant to the tribal-state gaming compacts entered into in accordance with the Indian Gaming Regulatory Act (18 U.S.C. Sec. 1166 to 1168, inclusive, and 25 U.S.C. Sec. 2701 et seq.).

89.    The software for the Game is an apparatus. The software for the Game also modifies mobile phones devices, such as iPhones and Android devices, into slot machines as defined by the California Penal Code.

90.    The Game adapts mobile phones into a device for use in a way that, as a result of the payment of money for virtual coins, the device is caused to be operated by reason of an element of chance in which the user may receive or become entitled to receive a thing of value or additional chance or right to use the Game's slot machines.

91.    The Game is an apparatus under §330b. Alternatively, mobile devices operating the Game are a machine, device or apparatus under §330b. Alternatively, mobile devices operating the Game together with servers are together a machine, device or apparatus under §330b.

92.    The software for the Game modifies mobile phones devices, such as iPhones and Android devices, into slot machines as defined by the California Penal Code.

93.    The Game's software operating on a mobile device, such as an iPhone or Android smartphone, is a machine, device or apparatus.

94.    In order to download the Game onto their mobile devices, users must interact with the hardware features of their mobile devices, including using the touch screen and hard buttons to enter account information, password pin code and other button sequences required to confirm and execute the download.

95.    Further, in order to make purchases within the Game, users must interact with the hardware elements of their phones, including the touchscreen and hard buttons. Users must enter payment information into their mobile devices using hardware features, including a keyboard. Users must also enter a password or pin code, press buttons and provide other identifying information through their

phone's hardware elements, such as the keyboard, camera or fingerprint reader, in order to purchase virtual coins from the Game.

96.    The Game is downloaded onto users' devices through servers owned, operated and/or controlled by Defendants. These servers have hardware components. When a user plays the Games through their mobile device, servers owned, operated and/or controlled by Defendants communicate with the user's mobile device. That communication between the servers owned, operated and/or controlled by Defendants and a user's mobile device takes place through hardware, including routers, switches, cables, and cell phone towers. Communication with the servers owned, operated or controlled by Defendants is required in order to provide users with the slot machines in the Game, update and repair the slot machines in the Game, complete purchases of virtual coins used to play the slot machines in the Game and to record players' balance of virtual coins needed to play the slot machines in the Game.

97.    Users operate the Game through the hardware features of their mobile device, including the touch screen.

98.    The Game adapts mobile phones into a device for use in a way that, as a result of the payment of money for virtual coins, the device is caused to be operated by reason of an element of chance in which the user may receive or become entitled to receive a thing of value or additional chance or right to use the Game.

99.    California Penal Code §319 provides: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by

whatever name the same may be known." The Game is an illegal lottery as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

100.    The Game is a scheme for the disposal or distribution of property by chance among persons who have paid valuable consideration for the chance of obtaining such property. Specifically, players of the Game spend money to buy virtual coins. The Game disposes of those virtual coins by chance.

101.    The virtual coins in the Game are "property" under §319. Section 7 of the Penal Code provides that "the word 'property' includes both real and personal property" and "the words 'personal property' include money, goods, chattels, things in action, and evidences of debt." These definitions are not exclusive of anything else properly coming within the terms defined. "A thing in action is a right to recover money or other personal property by a judicial proceeding." Civil Code, §953. "Property" is further defined in the Civil Code as a "thing of which there may be ownership." Civil Code, §654. There may be ownership, among other things, "of all obligations." Civil Code, §655. "An obligation is a legal duty by which a person is bound to do or not to do a certain thing." Civ. Code §1427. An obligation may arise from contract. Civ. Code §1428.

102.    Defendants' duty as the operators of the Game is to permit users to play further games in exchange for virtual coins. This is an obligation arising from contract and the right of the player in the matter is personal property and a thing in action. Cal. Civ. Code §663, §953.

103.    On information and belief, Defendants receives money, directly or indirectly, from the Game.

104.    The Ninth Circuit has found that virtual coins used to play mobile casino games similar to those in the Games constitute a thing of value under Washington's gambling law. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018). California courts have held that a reward of extended play by a

video game for winning is a thing of value within the meaning of the Penal Code definition. *See Merandette v. City & Cty. of San Francisco*, 88 Cal.App.3d 105, 114, 151 Cal.Rptr. 580, 586 (1979).

105.    To the extent the Game operating on mobile devices in connection to servers is not an illegal slot machines or that the Game does not include an illegal lottery, the Game violates California Penal Code §337j as unlicensed controlled games. California Penal Code § 337j(a) provides:

(a) It is unlawful for any person, as owner, lessee, or employee, whether for hire or not, either solely or in conjunction with others, to do any of the following without having first procured and thereafter maintained in effect all federal, state, and local licenses required by law:

(1) To deal, operate, carry on, conduct, maintain, or expose for play in this state any controlled game.

(2) To receive, directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game.

(3) To manufacture, distribute, or repair any gambling equipment within the boundaries of this state, or to receive, directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state.

106.    On information and belief, Defendants have not procured and thereafter maintained in effect all federal, state, and local licenses required by law to operate a controlled game.

107.    Defendants operates, carries on, conducts, maintains and exposes for play in California a controlled game through the Game. Defendants receives, directly or indirectly, compensation or reward of the revenue for keeping, running and carrying on the Game. Defendants manufacture, distribute and repair the Game

within the boundaries of California.

108.    California Penal Code §337j(e)(1) states that "[a]s used in this section, 'controlled game' means any poker or Pai Gow game, and any other game played with cards or tiles, or both, and approved by the Department of Justice, and any game of chance, including any gambling device, played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." *Id.* (emphasis added).

109.    To the extent the Game operating on mobile devices is not illegal under California's Penal Code (including §330b and §319), the Game is a controlled game under §337j(e)(1), because they are a game of chance played for credit or a thing of value not prohibited and made unlawful by statute of local ordinance.

110.    The virtual coins in the Game are a credit to continue playing the slot machines. The virtual coins in the Game are also a thing of value as held in *Kater*.

111.    Certain courts have found that in-game purchases in free-to-play mobile games that sell "loot boxes" are not things of value under California law, because the loot boxes and the virtual items they contain merely enhance gameplay and have no value outside of the game itself. *See, e.g. Soto v. Sky Union, LLC*, 159 F.Supp.3d 871 (N.D.Ill. 2016); *Mai v. Supercell OY*, Case No. 20-cv-05573-EJD, Doc. 62 (N.D.Cal. Jan. 3, 2023); *Coffee v. Google LLC*, No. 20-cv-03901, 2022 WL 94986, at *9 (N.D. Cal. Jan. 10, 2022); *Taylor v. Apple, Inc.*, No. 20-cv-03906-RS, 2022 WL 35601, at *2 (N.D. Cal. Jan. 4, 2022). In these cases, the courts found the virtual items in the loot boxes were not things of value, because they were not used to extend gameplay, but rather were mere enhancements to game that were truly free to play in an unlimited way.

112.    The virtual coins at issue here in the Game are distinguishable from those cases, because the virtual coins in the Game are used for players to extend

their gameplay. In *Soto*, *Mai*, *Coffee* and *Taylor*, the underlying gameplay was playable without any purchase. The purchases at issue were for randomized packs of virtual goods (loot boxes) that were not needed to play the games, but merely provided virtual goods that enhanced the gameplay. Further, those games were ones of skill with the purported game of chance being a secondary feature.

113.   In contrast, the Game here has a primary gameplay mechanic that is itself a game of chance - slot machines. The purchase of virtual coins is used to extend that gameplay, not merely to enhance it. For these reasons, the Ninth Circuit *Kater* decision is more applicable than the District Court decisions in *Soto*, *Mai*, *Coffee* and *Taylor*. Therefore, the virtual coins here are things of value and provide an additional chance to play the Game's slot machines.

114.   For these same reasons, the Game violates other California gambling laws as set forth below.

115.   In addition to being used to extend gameplay, the coins in the Game are things of value under California law.

116.   The Game is advertised and distributed through the App Store and Play Store alongside other social casino games that do not violate California gambling laws.

117.   The Game's descriptions in these advertisements and storefronts do not disclose that they violate California's or other state's gambling laws. Plaintiffs and other consumers reasonably rely on this omission to believe that the Game offers services that comply with the applicable laws. This belief is a material factor in their decision to download and play the Game, as opposed to another social casino game that does comply with gambling laws.

**The Game's Advertisements Violate The Law**

118.   Defendants' advertising of virtual coins in the Game violates 16 CFR §233.1(a) because the stricken deals displayed are not "actual, bona fide price at

which the article was offered to the public on a regular basis for a reasonably substantial period of time." Rather, the stricken coin values in the purported sale offered in the Game's store are "fictitious." The false strikethrough ads promote a false bargain where "the purchaser is not receiving the unusual value he expects."

119. These advertisements are also violative of Cal. Bus. & Prof. Code §17501, because the stricken coin values and dollar amounts were not "the prevailing market price … within three months next immediately preceding the publication of the advertisement." Nor do the sale offers "clearly, exactly and conspicuously state[] in the advertisement" when such former prices were prevailing.

120. The effectiveness of Defendants' deceitful advertising scheme is supported by longstanding scholarly research. In the seminal article entitled *Comparative Price Advertising: Informative or Deceptive?* (cited in *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), Professors Dhruv Grewal and Larry D. Compeau write that, "[b]y creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992). Thus, "empirical studies indicate that, as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases." *Id*. at 56 (emphasis added). For this reason, the Ninth Circuit in *Hinojos* held that a plaintiff making a claim of deceptive pricing (strikingly similar to the claim at issue here) had standing to pursue his claim against the defendant retailer. In doing so, the Court observed that "[m]isinformation about a product's 'normal' price is . . . significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

121.    Professors Compeau and Grewal reached similar conclusions in a 2002 article: "decades of research support the conclusion that advertised reference prices do indeed enhance consumers' perceptions of the value of the deal." Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Believe It Or Not*, J. of Consumer Affairs, Vol. 36, No. 2, at 287 (Winter 2002). The professors also found that "[c]onsumers are influenced by comparison prices even when the stated reference prices are implausibly high." *Id.* (emphasis added).

122.    In another scholarly publication, Professors Joan Lindsey-Mullikin and Ross D. Petty concluded that "[r]eference price ads strongly influence consumer perceptions of value . . . . Consumers often make purchases not based on price but because a retailer assures them that a deal is a good bargain. This occurs when . . . the retailer highlights the relative savings compared with the prices of competitors . . . [T]hese bargain assurances (BAs) change consumers' purchasing behavior and may deceive consumers." Joan Lindsey-Mullikin & Ross D. Petty, *Marketing Tactics Discouraging Price Search: Deception and Competition*, 64 J. of Bus. Research 67 (January 2011).

123.    Similarly, according to Professors Praveen K. Kopalle and Joan Lindsey-Mullikin, "research has shown that retailer-supplied reference prices clearly enhance buyers' perceptions of value" and "have a significant impact on consumer purchasing decisions." Praveen K. Kopalle & Joan Lindsey-Mullikin, *The Impact of External Reference Price On Consumer Price Expectations*, 79 J. of Retailing 225 (2003).

124.    The results of a 1990 study by Professors Jerry B. Gotlieb and Cyndy Thomas Fitzgerald, came to the conclusion that "reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An Investigation Into the Effects of Advertised Reference Prices On the Price*

*Consumers Are Willing To Pay For the Product*, 6 J. of App'd Bus. Res. 1 (1990). This study also concluded that "consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *Id*.

125.    The unmistakable inference to be drawn from this research and the Ninth Circuit's opinion in *Hinojos* is that the deceptive advertising through the use of false references employed here by Defendants is intended to, and does in fact, influence customer behavior—as it did Plaintiffs' purchasing decisions here—by artificially inflating customer perceptions of a given item's value and causing customers to spend money they otherwise would not have, purchase items they otherwise would not have, and/or spend more money than they otherwise would have absent the deceptive advertising.

126.    On information and belief, the Game and the false advertising presented to new users are designed to trap players in what is referred to in academia as a "compulsion loop." A compulsion loop is defined as habitual behavior that a human will repeat to gain a neurochemical reward: a feeling of pleasure and/or a relief from pain. Not doing the behavior causes discomfort. *Compulsion Loops: Compulsive Behavior As Mass Media* by Adam Crowe and Richard Buchanon (available at https://www.slideshare.net/adamcrowe/compulsion-loops#btnNext).

127.    On information and belief, mobile games such as Tycoon Casino maximize their profits by inducing players to enter into a compulsion loop. The Game here engages in misleading value and price comparison advertising to induce players into entering a compulsion loop of spending early in their interaction with the Game.

128.    On information and belief, once games such as Tycoon Casino are successful at deceiving users into believing they are receiving outsized values,

those users are more likely to continue maintaining that belief despite evidence to the contrary. Man-Pui Sally Chan, et al, *Debunking: A Meta-Analysis of the Psychological Efficacy of Messages Countering Misinformation*, 28 Psychol. Sci. 1531, 1531 (2017), https://cite.law/U5QS-2NF4 (meta-analysis focusing on "false beliefs … [that] occur when the audience initially believes misinformation and that misinformation persists or continues to exert psychological influence after it has been rebutted").

129.    Another cognitive bias exploited by the Game is known as "sunk cost" bias. Sunk cost bias describes a decision-making heuristic where an individual escalates his or her commitment to a previously chosen, but unsuccessful course of action to justify the prior "investments" in purchasing coins. Thus, but inducing players into making purchases in the Game through deceptive advertisements, Defendants creates a higher likelihood that those players will be committed to the Game and continue spending money in the Game.

130.    A phenomenon known as "chasing" (continuing to gamble to recoup losses) is "one of the central characteristics of pathological gamblers." Chasing is "widely regarded as a defining feature in disordered gambling," is "the most commonly endorsed item in screening tools for disordered gambling," and its presence "establishes and maintains a downward spiral of negative consequences for the gambler's finances, relationships, and mental well-being." Ke Zhang and Luke Clark, *Loss-chasing in gambling behaviour: neurocognitive and behavioural economic perspectives*, Current Opinion in Behavioral Sciences, 31:1-7 (Feb. 2020). Therefore, by inducing players into making early purchases in the Game through misleading sale advertisements, the Game increases impact of its gambling mechanics to push players into an addictive "chasing" phenomenon.

131.    Further, by creating a false sense of urgency in their shops' sale offers, the Game increases the likelihood that players will make an impulse

purchase.

## **APPLICABLE LAW**

132.   Mr. Molloy is a citizen and resident of Los Angeles County, California. He downloaded and played Tycoon Casino in California. He made purchases from Tycoon Casino in California. His purchases were processed by Apple, an entity headquartered in California.

133.   California's substantive laws may be constitutionally applied to the claims of Plaintiffs under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

134.   The application of California laws is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs, and California has a greater interest in applying its laws here than any other interested state.

135.   California law may be used on a class-wide basis, because the interests of other states do not outweigh California's interest in having its law applied.

136.   California has a unique interest in having its laws apply to this case, including to non-residents. The Game is distributed primarily through the Apple and Google mobile stores. These mobile stores are owned and operated by Apple and Google, both companies having headquarters in California. On information and belief, in distributing its Games through the Apple and Google stores, Defendants entered into developer agreements with Apple and Google governing the development and distribution of the Games. Those agreements, which Defendant entered into for the purposes of distributing the Games in the United

States apply California law.

137.    Consumers execute their transaction for the in-game coins in the Game with Apple and Google payment systems.

138.    Plaintiffs and other consumers enter into end user agreements with Apple and Google, which require the application of California law.

## CLASS ALLEGATIONS

139.    Plaintiff brings this action on behalf of himself and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All individuals located within the United States who, during the applicable limitations period, made a purchase of virtual coins in Tycoon Casino using real-world currency.

140.    The above-described class of persons shall hereafter be referred to as the "Class." The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

141.    In the alternative, Plaintiff seeks certification of the following class pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure:

All individuals located within the State of California who, during the applicable limitations period, made a purchase of virtual coins in Tycoon Casino using real-world currency.

142.    The above-described class of persons shall hereafter be referred to as the "California Class." The following people are excluded from the Class: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

143.    The Class and California Class are collectively referred to herein as "Classes." Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

144.    This case is appropriate for class treatment because Plaintiffs can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

145.    **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on

behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

146.    **Numerosity**. The members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The membership of the Classes is unknown to Plaintiffs at this time; however, it is estimated the Classes number in the hundreds, if not thousands. The identity of such membership is readily ascertainable via inspection of Defendant's or third-party books and records or other approved methods.  Similarly, Members of the Classes may be notified of the pendency of this action by mail, email, internet postings, social media, publications and/or in-game messaging.

147.    **Common Questions of Law or Fact:** There are common questions of law and fact as to Plaintiffs and all other similarly situated persons, which predominate over questions affecting only individual class members, including, without limitation:

a.    Whether the Game violates California's gambling laws;

b.    Whether Defendants engaged in the conduct alleged in the Complaint;

c.    Whether Defendants violated the applicable statutes alleged herein;

d.    Whether Defendants designed, advertised, marketed, distributed, sold, or otherwise placed the Game into the stream of commerce in the United States and California;

e.    Whether Defendants engaged in conduct directed to the State of California;

f.    Whether the Game's presentation of stricken values in its advertising of in-game purchases are misleading to a reasonable consumer;

g.    Whether Plaintiff and members of the Classes were injured and harmed directly by the Game;

h.    Whether Plaintiff and members of the Classes were injured and harmed directly by the Game's false advertising;

i.    Whether Plaintiff and members of the Classes are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts;

j.    Whether Plaintiff and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

148.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all members of the Classes were comparably injured through Defendants' misconduct described above.  As alleged herein, Plaintiffs, like the members of the Classes, made purchases they would not have otherwise made and were deprived of monies that rightfully belonged to them by Defendants.  Further, there are no defenses available to Defendants that are unique to Plaintiffs.

149.    **Superiority:** The nature of this action and the laws available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each class member were required to file an individual lawsuit, Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by the individual class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual class members against Defendants, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the

interest of the other class members not parties to adjudications or which would substantially impair or impede the ability of the class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

### FIRST CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Profession Code §17200 *et seq.***
**Illegal Gambling Against**

150.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

151.    Plaintiff brings this claim for relief on behalf of himself and all Classes.

152.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

153.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

154.    As a result of engaging in the conduct alleged in this Complaint, Defendant has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of the following laws:

(a) **California's Gambling Control Act (Cal. Bus. & Prof. Code §§ 19800, *et seq.*)**: Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons

involved in dealing, operating, carrying on, conducting, maintaining or exposing for play any gambling game shall apply for and obtain a valid state gambling license. The Game and their coins constitute a "gambling game" because they are a "controlled game," which is "any game of chance, including any gambling device…played for currency, check, credit, or any other thing of value that is not prohibited and made unlawful by statute or local ordinance." Cal. Penal Code § 337j(1). As alleged herein, Defendant operates, carries on, conducts, maintains, and exposes for play gambling activities. On information and belief, Defendant has not applied for or obtained any state gambling license, and therefore violates California's Gambling Control Act.

**(b) California Penal Code § 330a:** Titled "Possession or keeping of slot or card machine or card dice," section 330a declares that "[e]very person, who has in his or her possession or under his or her control…or who permits to be placed, maintained, or kept in any room, space, inclosure, or building owned, leased, or occupied by him or her, or under his or her management or control, any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money, representative or articles of value, checks, or tokens, redeemable in or exchangeable for money or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the

machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance…is guilty of a misdemeanor." Defendant violates section 330a because as alleged, Defendant possesses or permits illegal slot machines where tokens or things of value are won or lost upon chance.

**(c) California Penal Code § 330b:** Titled "Possession or keeping of slot machines or devices," section 330b declares that "[i]t is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or permit the operation, placement, maintenance, or keeping of, in any place, room, space, or building owned, leased, or occupied, managed, or controlled by that person, any slot machine or device, as defined in this section." It is also "unlawful for any person to make or permit the making of an agreement with another person regarding any slot machine or device, by which the user of the slot machine or device, as a result of the element of hazard or chance or other unpredictable outcome, may become entitled to receive money, credit, allowance, or other thing of value or additional chance or right to use the slot machine or device…" As alleged, Defendant makes, repairs, owns and gives away the Games' slot machines. Further, as alleged, Defendant has made agreements with its subsidiaries, Apple, Google, Plaintiffs, members of the Classes and others regarding slot machines or devices and permits the operation, placement, maintenance, or keeping of a slot machine or device as defined by Penal Code § 330b(d).

**(d) California Penal Code §§ 330.1 et seq.**: Titled "Manufacture,

possession, or disposition of slot machines or device," section 330.1(a) declares that "Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports, or exposes for sale or lease, or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used, or kept in any room, space, or building owned, leased, or occupied by him or her or under his or her management or control, any slot machine or device as hereinafter defined, and every person who makes or permits to be made with any person any agreement with reference to any slot machine or device as hereinafter defined, pursuant to which agreement the user thereof, as a result of any element of hazard or chance, may become entitled to receive anything of value or additional chance or right to use that slot machine or device, or to receive any check, slug, token, or memorandum, whether of value or otherwise, entitling the holder to receive anything of value, is guilty of a misdemeanor." Defendant violates section 330.1 because as alleged, Defendant has made agreements with others regarding slot machines or devices, or otherwise possess or permit illegal slot machines or devices where things of value are won as a result of chance "irrespective of whether it may, apart from any element of hazard or chance, also sell, deliver, or present some…entertainment, or other thing of value" (Cal. Penal Code § 330.1(f)). The virtual coins that may be won by paying to play the slot machines in the Games are a "token" or "thing of value" as used in section 330.1 and as defined by section 330.2.

**(e) California Penal Code § 337j(a)(1)**: By "operat[ing], carry[ing] on, conduct[ing], maintain[ing], or expos[ing] for play" unlicensed

gambling in this state, Defendant violates Penal Code § 337j(a)(1).

**(f) California Penal Code § 337j(a)(2)**: By "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game," Defendant violates Penal Code § 337j(a)(2).

**(g) California Penal Code § 337j(a)(3)**: Through the "manufacture, distribut[ion], or repair [of] any gambling equipment within the boundaries of this state" or "receiv[ing], directly or indirectly, any compensation or reward for the manufacture, distribution, or repair of any gambling equipment within the boundaries of this state" Defendant violates Penal Code § 337j(a)(3).

**(h) California Penal Code §319:** "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." The Games are illegal lotteries as defined by California Penal Code 319. Cal. Penal Code §§319, 322, 323, 326.

155.    Defendants have violated the "unlawful" prong under the UCL. Defendants have violated the above-identified California Penal Code sections by making, selling, distributing, entering into agreements relating to and profiting from the Game. Defendants have further violated the above-identified California Penal Code sections through the sale of virtual coins in the Game.

156.    Because Defendants' profiting from the sale of virtual coins in the

Game is illegal, Plaintiff and members of the Classes, who by definition purchased

such illegal virtual coins, have suffered a cognizable harm under UCL.

*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1086 (11th Cir. 2019);

*Allergan U.S. v.Imprimis Pharm., Inc.*, 2019 U.S. Dist. LEXIS 163228, at *27 n.9

(C.D. Cal. Mar. 27, 2019); *Franz v. Beiersdorf, Inc.*, 745 F. App'x 47, 48 (9th Cir.

2018)).

157.   A business act or practice is "unfair" under the UCL if the reasons,

justifications, and motives of the alleged wrongdoer are outweighed by the gravity

of the harm to the alleged victims. A business act or practice is "fraudulent" under

the UCL if it is likely to deceive members of the consuming public.

158.   The sale of virtual coins in the Game is unfair and fraudulent under

the UCL, because Defendants failed to disclose to Plaintiff and members of the

Classes that the Game is illegal under California's gambling laws. That omission

was a material factor in Plaintiff's and class members' decision to download, play

and expend money purchasing virtual coins in the Game. Had Plaintiff and

members of the Classes known that the Game violated California's gambling laws,

they would not have began playing the Game or spending money in the Game.

159.   As a result of these violations under each of the fraudulent, unfair, and

unlawful prongs of the UCL, Defendants has been unjustly enriched at the expense

of Plaintiff and the putative class members. Specifically, Defendants have been

unjustly enriched by obtaining revenues and profits that they would not otherwise

have obtained absent their false, misleading, and deceptive conduct.

160.   Plaintiff enjoys playing mobile games and is continuously in the

market for lawful mobile games. As such, he is likely to continue to encounter

Defendants' unlawful Game absent injunctive relief.

161.   Through its unfair acts and practices, Defendants improperly obtained

money from Plaintiff and members of the Classes. As such, Plaintiff, on behalf of

himself and the putative Classes, requests that this Court enjoin Defendants from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiff and members of the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## SECOND CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Profession Code §17200 *et seq.*
### Unlawful, Unfair and Fraudulent Advertising

162.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

163.    Plaintiff brings this claim for relief on behalf of himself and all Classes.

164.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

165.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

166.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

167.    Defendants have violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

168.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes-similar to those used in the Game's sale offers in all material respects-as deceptive practices that would violate the FTC Act.

169.   16 C.F.R. §233.1 states:

(a) One of the most commonly used forms of bargain
advertising is to offer a reduction from the advertiser's own
former price for an article. If the former price is the actual,
bona fide price at which the article was offered to the
public on a regular basis for a reasonably substantial period
of time, it provides a legitimate basis for the advertising of
a price comparison. Where the former price is genuine, the
bargain being advertised is a true one. If, on the other hand,
the former price being advertised is not bona fide but
fictitious - for example, where an artificial, inflated price
was established for the purpose of enabling the subsequent
offer of a large reduction - the "bargain" being advertised is
a false one; the purchaser is not receiving the unusual value
he expects. In such a case, the "reduced" price is, in reality,
probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because
no sales at the advertised price were made. The advertiser
should be especially careful, however, in such a case, that
the price is one at which the product was openly and
actively offered for sale, for a reasonably substantial period
of time, in the recent, regular course of his business,
honestly and in good faith - and, of course, not for the
purpose of establishing a fictitious higher price on which a
deceptive comparison might be based. And the advertiser
should scrupulously avoid any implication that a former
price is a selling, not an asking price (for example, by use
of such language as, "Formerly sold at $____"), unless
substantial sales at that price were actually made.

(c) The following is an example of a price comparison based
on a fictitious former price. John Doe is a retailer of Brand
X fountain pens, which cost him $5 each. His usual markup
is 50 percent over cost; that is, his regular retail price is
$7.50. In order subsequently to offer an unusual "bargain",
Doe begins offering Brand X at $10 per pen. He realizes
that he will be able to sell no, or very few, pens at this
inflated price. But he doesn't care, for he maintains that
price for only a few days. Then he "cuts" the price to its
usual level - $7.50 - and advertises: "Terrific Bargain: X
Pens, Were $10, Now Only $7.50!" This is obviously a
false claim. The advertised "bargain" is not genuine.

(d) Other illustrations of fictitious price comparisons could be

given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

(e) If the former price is set forth in the advertisement, whether accompanied or not by descriptive terminology such as "Regularly," "Usually," "Formerly," etc., the advertiser should make certain that the former price is not a fictitious one. If the former price, or the amount or percentage of reduction, is not stated in the advertisement, as when the ad merely states, "Sale," the advertiser must take care that the amount of reduction is not so insignificant as to be meaningless. It should be sufficiently large that the consumer, if he knew what it was, would believe that a genuine bargain or saving was being offered. An advertiser who claims that an item has been "Reduced to $9.99," when the former price was $10, is misleading the consumer, who will understand the claim to mean that a much greater, and not merely nominal, reduction was being offered.

170. California law also prohibits false former pricing schemes. Cal. Bus. Code. §17501 entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

171. California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal.

Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id*. §(a)(13).

172.  The Game's use of strikethrough graphics and comparative values violate the unlawful prongs of the UCL, because they violate 16 C.F.R. §233.1, Cal. Bus. Prof. Code §1750, Cal. Civ. Code §§1770(a)(9) and (a)(13).

173.  Defendants also violated the "unfair" prong of the UCL by falsely representing that its consumers received a more coins as compared to a referenced "original" coin quantity shown in the Game's store. In fact, Defendants displayed to users a fictitious stricken reference coin quantity.

174.  The gravity of the harm to Plaintiff and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendants may have had for engaging in such deceptive acts and practices.

175.  Plaintiff and members of the Classes suffered cognizable harm as a result of these unfair acts and practices. Plaintiff and members of the Classes reasonably understood the strikethrough graphics in the Game described herein as communicating the ordinary, normal, prevailing former value for virtual coins in the Game. In reality, the stricken values were fictitious. Plaintiff and members of the Classes reasonably relied on their understanding in their decision to make in-game purchases in the Game. But for Defendants' misleading and false advertising and Plaintiff's and class members' reasonable reliance thereon, Plaintiff and members of the Class would not have made some or all of their purchases in the Game.

176.  As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of Plaintiff and the Classes. Specifically, Defendants have been unjustly

enriched by obtaining revenues and profits that it would not otherwise have
obtained absent its false, misleading, and deceptive conduct.

177.   Plaintiff enjoys playing mobile games and is continuously in the
market for lawful mobile games. As such, he is likely to continue to encounter
Defendants' unlawful Game absent injunctive relief.

178.   Through its unfair acts and practices, Defendants improperly obtained
money from Plaintiff and members of the Classes. As such, Plaintiff, on behalf of
himself and the putative Classes, request that this Court cause Defendants to
restore this money to Plaintiff and the members of the Classes, and to enjoin
Defendants from continuing to violate the UCL, and/or from violating the UCL in
the future. Otherwise, Plaintiff and members of the Classes may be irreparably
harmed and/or denied an effective and complete remedy if such an order is not
granted.

**THIRD CLAIM FOR RELIEF**
**Violation of California False Advertising Law ("FAL")**
**Cal. Business & Professional Code §17500 *et seq.***

179.   Plaintiff incorporate by reference all allegations in this Complaint and
restates them as if fully set forth herein.

180.   The   FAL   prohibits unfair, deceptive, untrue, or misleading
advertising, including, but not limited to, false statements as to worth, value, and
former price.

181.   Furthermore, the FAL provides that: "No price shall be advertised as a
former price of any advertised thing, unless the alleged former price was the
prevailing market price as above defined within three months next immediately
preceding the publication of the advertisement or unless the date when the alleged
former price did prevail is clearly, exactly and conspicuously stated in the
advertisement." Cal. Bus. & Prof. Code §17501.

182.    The false strikethrough graphics in the Game's shops misrepresent the existence of a sale whereby players can allegedly purchase more coins than they normally could for the same price.

183.    Plaintiff enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendants' unlawful Game absent injunctive relief.

184.    Through its unfair acts and practices, Defendants have improperly obtained money from Plaintiff and members of the Classes. As such, Plaintiff, on behalf of himself and the putative Classes, request that this Court cause Defendants to restore this money to Plaintiff and the members of the Classes, and to enjoin Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiff and members of the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is no granted.

## FIFTH CLAIM FOR RELIEF
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code. §1750 *et seq.*
### Illegal Gambling

185.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

186.    Plaintiff and members of the Classes are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

187.    Defendants are each a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

188.    The Game is a "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b). Specifically, the Game provides online gaming services. The

purchase of in-game coins for the Game is a transaction for accessing those
services. The purpose of the in-game coins is to access the gameplay services
offered by the Game and the purchase of in-game coins is at times necessary to
access those services.

189.   By engaging in the conduct described herein, Defendants have
violated subdivision (a)(14) of California Civil Code §1770 by: "Representing that
a transaction confers or involves rights, remedies, or obligations that it does not
have or involve, or that are prohibited by law." Under this provision, omissions are
actionable.

190.   Defendants have advertised the Game while omitting that the Game
are engaged in illegal gambling.

191.   By engaging in the conduct described herein, Defendant has also
violated subdivision (a)(26) of California Civil Code §1770 by "Advertising,
offering for sale, or selling a financial product that is illegal under state or federal
law…."

192.   Defendants advertise the Game and their illegal financial products on
its website, through social media and through the App Store and Play Store.
Defendants also advertise, offer for sale and sell virtual coins in the Game that are
illegal financial products.

193.   Defendants violated the CLRA by representing to or omitting from
Plaintiff and members of the Classes that the transactions involving virtual coins in
the Game confer or involve rights to potentially valuable prizes, when in fact these
transactions constitute unlawful gambling transactions that are prohibited by law,
foster compulsive and addictive behavior, and are a predatory form of duplicitously
profiting from others. These omissions are material because a reasonable consumer
would deem them important in determining how to act in the transaction at issue
and, if prohibited by law, should not have been permitted to purchase virtual coins.

Further, the omissions about virtual coins are misleading in light of other facts that Defendants did disclose.

194.    Defendants' violations of the CLRA proximately caused injury in fact to Plaintiff and the members of the Classes.

195.    Plaintiff and the members of the Classes transacted with the Game on the belief that the transaction was lawful. Indeed, a reasonable consumer believes in the lawfulness of his or her transactions.

196.    Plaintiff enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendants' unlawful Game absent injunctive relief.

197.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Classes, seek a Court order enjoining the above-described wrongful acts and practices of Defendants and attorneys' fees.

198.    Plaintiff, individually and on behalf of the other members of the Class, do not seek damages for this claim for relief.

## FIFTH CLAIM FOR RELIEF
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code. §1750 *et seq.*
### False and Misleading Sales

199.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

200.    Plaintiff and members of the Classes are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

201.    Defendants are each a "person" within the meaning of Cal. Civ. Code §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

202.    The Game is a "service" within the meaning of Cal. Civ. Code.

§§1761(a) and (b). Specifically, Tycoon Casino each provide online gaming services. The purchase of in-game coins for these Game is a transaction for accessing those services. The purpose of the in-game coins is to access the gameplay services offered by the Game and the purchase of in-game coins is necessary at times to access those services.

203.    Defendants have violated §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts for the purchase of gold coins via false strikethrough ads.

204.    Plaintiff and the putative Classes suffered actual damages as a direct and proximate result of Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as evidenced by the substantial sums Defendants has pocketed.

205.    Plaintiff enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendants' unlawful Game absent injunctive relief.

206.    Plaintiff, on behalf of himself and the Classes, demand judgment against Defendants for injunctive relief and attorney's fees.

207.    Plaintiff, individually and on behalf of the other members of the Classes, do not presently seek damages for this claim, but reserve the right to seek leave to amend pursuant to §1782(d) to add a claim for relief for damages.

## SIXTH CLAIM FOR RELIEF

### Fraud

208.    Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

209.    Defendants advertised the Game to Plaintiff and members of the Classes and omitted that the Game violated California's gambling laws.

210.   Defendants presented the Game publicly as free-to-play "social casino" games and omitted that the Game provides illegal slot machines under California.

211.   These representations and omissions were false because they the Game violates California's gambling laws.

212.   On information and belief, Defendants knew, actually or constructively, that these representations and omissions were false following the Ninth Circuit decision in *Kater*.

213.   These representations and omissions were material to the decision of Plaintiff and members of the Classes in downloading and playing the Game.

214.   Plaintiff and members of the Classes reasonably relied on these representations and omissions in deciding to download and play the Game.

215.   Had Plaintiff and members of the Classes known the Game was engaging in illegal gambling, they would not have downloaded and played the Game.

216.   Plaintiff and members of the Classes were harmed, because if they had never downloaded and played the Game they would not have played the Game's illegal slot machines, been subjected to the Game's false advertising, induced into making purchases of virtual coins and lost those coins to the Game's slot machines.

217.   Defendants represented to Plaintiff and members of the Classes that the stricken coin quantities represented the ordinary, normal and prevailing offer by the Games.

218.   These representations were false because the prevailing quantity of coins was higher than represented by Defendants as a reference quantity.

219.   Defendants knew these representations were false, because it had knowledge of and control over the Game's advertisements and offers for coins.

220.   Defendants designed the graphical images of the advertisements in a

way that intentionally attracted Plaintiff and the members of the Classes to the enticing but false claims regarding gold amounts.

221.   Plaintiff and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned coin bundles.

222.   Plaintiff and the putative Classes were harmed because, had Plaintiff and class members known the claims were false, they would not have made some or all of those purchases.

223.   Plaintiff and class members' reliance on Defendants' misrepresentations in its advertisements was a substantial factor in causing harm to Plaintiff and the putative Classes.

224.   Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and members of the Classes and will continue to both damage Plaintiff and the Classes and deceive the public unless enjoined by this Court.

225.   Plaintiff enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendants' unlawful Game absent injunctive relief.

226.   Plaintiff, on behalf of himself and the Classes, demand judgment against Defendant for damages, injunctive relief, restitution and attorney's fees.

## SEVENTH CLAIM FOR RELIEF

### Negligent Misrepresentation

227.   Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

228.   Defendants advertised the Games to Plaintiffs and members of the Classes and omitted that the Game violated California's gambling laws.

229.   Defendants presented the Game publicly as a free-to-play "social

casino" game and omitted that the Game provided illegal slot machines under California law.

230.   These representations and omissions were false because the Game violates California's gambling laws.

231.   Defendant had a duty to know and should have known that these representations and omissions were false following the Ninth Circuit decision in *Kater*.

232.   These representations and omissions were material to the decision of Plaintiff and members of the Classes in downloading and playing the Games.

233.   Plaintiff and members of the Classes reasonably relied on these representations and omissions in deciding to download and play the Game.

234.   Had Plaintiff and members of the Classes known the Game was engaging in illegal gambling, they would not have downloaded and played the Game.

235.   Plaintiff and members of the Classes were harmed, because if they had never downloaded and played the Game they would not have played the Game's illegal slot machines, been subjected to the Game's false advertising, induced into making purchases of virtual coins and lost those coins to the Game's slot machines.

236.   Defendants represented to Plaintiff and members of the Classes when they began playing the Game that the stricken coin quantities represented the ordinary, normal and prevailing offer by the Game.

237.   These representations were false because the prevailing quantity of coins was higher than represented by Defendant as a reference quantity.

238.   Defendants knew these representations were false, because it had knowledge of and control over the Game's advertisements and offers for coins.

239.   Defendants designed the graphical images of the advertisements in a way that intentionally attracted Plaintiff and the members of the Classes to the

enticing but false claims regarding gold amounts.

240. Plaintiff and the putative Classes reasonably relied upon the claims made in the advertisements in deciding to purchase the aforementioned coin bundles.

241. Plaintiff and the putative Classes were harmed because, had Plaintiff and class members known the claims were false, they would not have made some or all of those purchases.

242. Plaintiff and class members' reliance on Defendants' misrepresentations in its advertisements was a substantial factor in causing harm to Plaintiff and the putative Classes.

243. Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and members of the Classes and will continue to both damage Plaintiff and the Classes and deceive the public unless enjoined by this Court.

244. Plaintiff enjoys playing mobile games and is continuously in the market for lawful mobile games. As such, he is likely to continue to encounter Defendants' unlawful Game absent injunctive relief.

245. Plaintiff, on behalf of himself and the Classes, demand judgment against Defendants for damages, injunctive relief, restitution and attorney's fees.

## **PRAYER FOR RELIEF**

Plaintiff prays for relief and judgment against Defendants as follows:

A. Certifying the proposed Classes defined herein;

B. Appointing Plaintiff as Class Representatives;

C. Appointing counsel for Plaintiff as Class Counsel;

D. Declaring Defendants' conduct to be unlawful;

E. Awarding Plaintiff and members of the Classes compensatory damages and actual damages in an amount to be determined by proof;

F.  Awarding Plaintiff and members of the Classes actual and statutory damages;

G.  Disgorging Defendants of their unjust profits;

H.  For punitive damages;

I.  For civil penalties;

J.  For declaratory and equitable relief, including restitution and disgorgement;

K.  For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

L.  Awarding Plaintiff the costs of prosecuting this action, including expert witness fees;

M. Awarding Plaintiff reasonable attorney's fees and costs as allowable by law;

N.  Awarding pre-judgment and post-judgment interest; and

O.  Granting any other relief as this Court may deem just and proper.

DATED: June 2, 2023                    THE RYAN LAW GROUP

_____
Andrew T. Ryan
Attorney for Plaintiff

COMPLAINT

## <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial on all issues and claims so triable.


DATED: June 2, 2023                    THE RYAN LAW GROUP

_____
                                        Andrew T. Ryan
                                        Attorney for Plaintiff